**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**CONTINENTAL DIVIDE ELECTRIC**
**COOPERATIVE, INC.,**

      **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　　　　　　**No. 1:24-cv-00281-JCH-JFR**

**DAVEY RESOURCE GROUP, INC.,**

      **Defendant.**
_____


**DAVEY RESOURCE GROUP, INC.,**

      **Defendant/Counterclaim Plaintiff,**

**v.**

**CONTINENTAL DIVIDE ELECTRIC**
**COOPERATIVE, INC.,**

      **Plaintiff/Counterclaim Defendant.**


**<u>MEMORANDUM OPINION AND ORDER</u>**

This case arises from a dispute regarding a contract to conduct an inventory audit for an electric utility. Each party believes the other breached the contract first with resulting damages. Plaintiff Continental Divide Electric Cooperative, Inc., ("Continental" or "CDEC") claims that Defendant Davey Resource Group, Inc., ("Davey" or "DRG") breached based on untimely and deficient performance. Davey counters that Continental breached by forcing Davey to stop work, even though it elected under the contract to fix the issues Continental raised with the audit, and by refusing to pay outstanding invoices for Davey's work. Continental brings claims for breach of contract and breach of the implied covenant of good faith and fair dealing and seeks to recover all

amounts paid under the contract. (Compl. ¶¶ 42-61, Dkt. No. 1-1; Pl.'s Resp. 12, Dkt. No. 69.) Davey denies the claims and asserts the following counterclaims: breach of contract, account stated, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. (*See* Answer, Dkt. No. 4.) Davey seeks payment of the outstanding balance owed to Davey under the invoices and per the contract, interest, late fees, and attorney's fees and costs. (*Id.* at 22-26.)

CDEC filed a *Motion for Partial Summary Judgment* (Dkt. No. 64), and DRG filed a *Motion for Summary Judgment* (Dkt. No. 66), both of which are fully briefed. CDEC seeks partial summary judgment in its favor on its breach of contract claim against Davey and on Davey's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. CDEC's motion does not seek judgment on its own claim for breach of the implied covenant of good faith and fair dealing. Davey requests judgment in its favor on CDEC's claims and on its counterclaims.

Also, before the Court is CDEC's *Motion to Exclude Expert Opinion Testimony of Scott Freeburn* (Dkt. No. 62). DRG retained Mr. Freeburn to form an opinion on the operational conduct of DRG under the Service Agreement and as to the conclusions reached by Michael Morrison, Ph.D, in his Economic Report. (Report 3, Dkt. No. 68-3.) Mr. Freeburn's opinions are based on the language of the Agreement and on his experience managing joint use work and work in the industry. (*Id.*) Arguing that Mr. Freeburn's report and proposed testimony do not meet the standards under federal law, including Federal Rule of Evidence 702, CDEC seeks to exclude the opinion testimony of Mr. Freeburn entirely. (Pl.'s Mot. 1-2, Dkt. No. 62.)

After careful consideration of the briefs, evidence, and law, the Court concludes that CDEC's partial motion for summary judgment should be denied. As for Davey's motion, Davey is entitled to summary judgment on consequential damages and on CDEC's claim for breach of the

implied covenant of good faith and fair dealing, but it should otherwise be denied. The Court will resolve the multitude of factual issues at a bench trial that will be scheduled by separate notice. Because this trial will proceed with the Court as the factfinder, it is most efficient to resolve the issues regarding the opinion testimony of Mr. Freeburn at trial. The Court will therefore stay decision on the motion to exclude Mr. Freeman's expert opinion testimony until trial.

## I.    LEGAL STANDARD

When both parties move for summary judgment, a court must analyze each motion individually and on its own merits. *See Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). When the parties file cross motions for summary judgment, a court may assume that no evidence needs to be considered other than that filed by the parties. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). The existence of a genuine issue of material fact, however, precludes granting summary judgment. *Id.*; *Buell Cabinet*, 608 F.2d at 433.

The moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

## II.    FACTUAL BACKGROUND

The following facts are undisputed. Disputed facts, and the parties' respective evidence in support and in opposition, are explained in footnotes.

### A.  The parties and their agreement

Continental is an electric service provider for approximately five counties in New Mexico. (Def.'s UF[1] ¶ 2, Dkt. No. 67.) Continental's power-distribution system includes 28 "circuits" or "feeders" that vary in size from a few dozen power poles to several thousand poles. (Pl.'s UF ¶ 18, Dkt. No. 65.) The circuits refer to a specific section within CDEC's service area where the pole or meter is located. (Def.'s UF ¶ 6, Dkt. No. 67.)  Continental has licensing agreements with third-party joint users that contain clauses related to ensuring that the joint users have not attached to more poles than they say they have attached to. (*Compare* Larsen Dep. 28:14-25, Dkt. No. 65-4; *with* Def.'s Resp. ¶ 30, at 11, Dkt. No. 70.)

Davey is a leading provider of natural resource and utility consulting services. (Def.'s UF ¶ 1, Dkt. No. 67.) Continental engaged Davey to perform a full inventory audit ("the Audit") for it. (Def.'s UF ¶¶ 3-4, ECF No. 67.)

In response to an RFP (Request for Pricing), Davey provided to CDEC a document dated February 28, 2022, called the "Joint Pole Attachment Audit Proposal" ("the Proposal"). (Pl.'s UF ¶ 2, Dkt. No. 65.) Page 2 of the Proposal says, "Success of this audit/inventory will be measured by the quality of the data collected in the field and by completing the project within CDEC's allotted time frame." (Pl.'s Ex. 1, Dkt. No. 65-1 at 15 of 16).

On May 2, 2022, the parties signed the "Joint Pole Attachment Audit Service Agreement" (hereinafter "the Agreement" or "the Contract"), drafted by Davey. (Pl.'s UF ¶ 1, Dkt. No. 65;

---

[1] "Undisputed Fact" or "UF" refers to those portions of facts set forth in the parties' respective briefs that the opposing party did not dispute or failed to refute with supporting evidence. These include supported factual assertions raised in the responses that were not refuted in the replies or by evidence in the initial motions.

Contract 1, Dkt. No. 1-1 at 16 of 196.) According to the Contract's "Exclusive Terms and Conditions" provision, the parties stated their intent "for this Agreement, together with Exhibit A, to exclusively govern and control each of the parties' respective rights and obligations regarding the Services (as defined below)." (Contract 1, Dkt. No. 1-1 at 16 of 196.) The "Entire Agreement; Amendments" section says, "This Agreement, together with Exhibit A, constitutes the entire agreement between the parties and supersedes all other communications, oral and written, between the parties relating to the subject matter of this Agreement." (*Id.* at 6).[2]

Exhibit A to the Contract, entitled "Specification and Compensation," contains a table listing work to be performed by Davey and the prices for that work. (*See* Contract 9, Dkt. No. 1-1 at 24 of 196.) According to the "Notes" section of the table, Davey was tasked with the following: capturing GPS location; pole stamps; equipment type, size, and phase; conducting visual National Electric Safety Code ("NESC") violation inspections while documenting the most egregious issues; joint use type, company and quantity; tagging joint use companies; replacing missing or damaged pole tags; and capturing 3 photos per pole with date and time stamp, with work "to be performed with NISC's MapWise platform with the ability to connect to CDEC's VPN from a remote location to perform daily data check in and check outs." (*Id.*; *see also* Def.'s UF ¶ 7, Dkt. No. 67 at 4 of 25.)[3] Davey was also required to capture one photo with date and time stamp for the

---

[2] CDEC asserts that this Proposal was incorporated into the Contract as Exhibit B to the Contract, while Davey argues that only Exhibit A was incorporated, not the Proposal. In support, CDEC cites to pages 8 and 10 of the Contract. (*See* Pl.'s Reply 1-2, Dkt. No. 72.) It is undisputed that page 8 of the Contract, entitled "Contractor's Proposal," which was signed by representatives from both Davey and CDEC, provides: "CONTRACTORS PRICE PROPOSAL (EXHIBIT A) dated February 28th, 2022, shall be considered part of this agreement. Scope of work (methodology) and pricing outline shall be considered as part of this agreement." (Contract 8, Dkt. No. 1-1 at 23 of 196.) Additionally, the parties do not dispute that page 10 of the Contract, entitled, "Exhibit B: Proposal," is otherwise blank. (*Id.* at 10, Dkt. No. 1-1 at 25 of 196.) Davey relies on the "Exclusive Terms and Conditions," (*id.* ¶ 1, at 1, Dkt. No. 1-1 at 16 of 196), and "Entire Agreement; Amendments," (*id.* ¶ 25, at 6, Dkt. No. 1-1 at 21 of 196), provisions in the Contract to support its position that the Proposal was not integrated into the Contract. According to Davey, only the Agreement and Exhibit A constitute the Contract.

[3] Continental uses NISC's MapWise platform for electric mapping to find the location of, for example, poles, electric connections, safety repairs, etc. (*See* Larson Dep. 85:22-23, 97:1-16, Dkt. No. 70-1.)

meters. (*See* Contract 9, Dkt. No. 1-1 at 24 of 196.) The Contract required Davey to complete the Audit by November 4, 2022. (Pl.'s UF ¶ 3, Dkt. No. 65.)

As set forth in the Contract, amendments to the agreement must be "in writing signed by both parties." (Contract 6, Dkt. No. 1-1 at 21 of 196.) The Contract further provides: "No waiver by either party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the party so waiving." (*Id.* at 5 ¶ 23, Dkt. No. 1-1 at 20 of 196.)

The Agreement additionally contained an "Approval of Work" provision:

[CDEC] shall have a period of 14 calendar days to approve the pilot feeder data and thirty calendar (30) days from delivery of completed work from the Davey to review and reject all work not performed in accordance with the specifications or within the 97% accuracy standard per circuit on the full-scale project. Upon such rejection, Davey shall, at its own expense, complete said work in accordance with the specifications, except that such completion shall not constitute a waiver of any claim by the Davey that the work rejected is in fact in accordance with the specifications and the Davey is entitled to full compensation for the work ordered by [CDEC] under this article. After the 30-day review period, all delivered work will be deemed to have been approved and accepted by [CDEC] unless there are latent defects in the work.

(*Id.* ¶ 28, at 6, Dkt. No. 1-1 at 21 of 196.) The "Accuracy Statement" said that Davey "will conform to a 97% accuracy rate per circuit," and that the "accuracy rate will be calculated based on the total number of attribute errors to the total number of attributes." (*Id.* ¶ 29.) Further, "If the circuit fails, the accuracy rate Davey will be notified, and Davey will review errors with CUSTOMER and review an additional 5% of the features on that circuit." (*Id.* ¶ 29, Dkt. No. 1-1 at 22 of 196 (comma placement as in original).)

The "Limited Warranty" clause in the Contract provided:

For a period of one (1) year from the date Services are performed (the "Warranty Period"), Davey warrants to Customer that the Services will be performed in a timely, professional, and workmanlike manner by qualified personnel (the "Limited Warranty"). If it is determined that Davey has breached the Limited Warranty, Davey will, in its reasonable discretion, either: (i) re-perform the defective part of the Services or (ii) credit or refund the fees paid for the defective part of the

Services. **This remedy will be Customer's sole and exclusive remedy and Davey's entire liability for any breach of the Limited Warranty.**

(*Id.* ¶ 5, at 2, Dkt. No. 1-1 at 17 of 196 (bold in original).)

Under the "Limitation of Liability" section, the parties agreed:

**…in no event shall either party be liable for any indirect, incidental, special, exemplary, punitive, or enhanced damages, arising out of, or relating to, this Agreement or in connection with any breach under this Agreement…. To the greatest extent permitted by law, in no event shall Davey's aggregate liability arising out of or related to this Agreement, whether arising out of or related to breach of contract, tort (including negligence), indemnification obligations, or otherwise, exceed the applicable insurance limits set forth in <u>Section 15</u> (the "Liability Cap").**

(Contract ¶ 13.1, at 3-4, Dkt. No. 1-1 at 18-19 of 196 (bold in original).) Section 15, the "Insurance" clause, says, as relevant here, that Davey must maintain "the following minimum limits of insurance: … (b) Commercial General Liability Insurance in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate;…." (*Id.* ¶ 15, at 4, Dkt. No. 1-1 at 19 of 196.) In 2022 and 2023, Davey maintained a general liability insurance policy with Davey named as the insured and CDEC named as an additional insured. (Pl.'s UF ¶ F, Dkt. No. 69.) The limits of liability for that policy were $5,000,000 per occurrence and $5,000,000 aggregate. (*Id.*) According to the Agreement, a prevailing party in a lawsuit to enforce the Agreement may recover its reasonable attorneys' fees and costs. (Def.'s UF ¶ 22, Dkt. No. 67.)

Finally, the Contract contained a termination provision, which as relevant here, says that either party may terminate the Agreement "effective upon written notice to the other Party (the 'Defaulting Party'), if the Defaulting Party: (a) materially breaches this Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the Defaulting Party does not cure such breach within 15 days after receipt of written notice of the breach…." (Contract ¶ 17.2, at 5, Dkt. No. 1-1 at 20 of 196.)

7

**B.  The Audit**

The full inventory audit required Davey to gather numerous pieces of information about each of the 61,817 poles and 23,720 meters within CDEC's service area in New Mexico. (Def.'s UF ¶ 5, Dkt. No. 67.) Out of the various attributes CDEC tasked Davey with collecting, CDEC instructed Davey to collect information on "joint use" attributes or "foreign attachments," which refer to the equipment of third parties attached to a specific pole. (Def.'s UF ¶ 8, Dkt. No. 67.) Roughly 18,000 of the 61,817 poles Davey was to audit contained joint users. (Def.'s UF ¶ 9, Dkt. No. 67.) Only three to five attributes for each of those 18,000 poles deal with joint use. (*Id.*) Photos were considered an attribute. (Pl.'s UF ¶ 36, Dkt. No. 65.) The Agreement, however, explicitly calls for Davey to collect data beyond simply joint use information. (Def.'s UF ¶ 10, Dkt. No. 67.)

Davey used four different types of employees to perform the Audit: field technicians, digitizers, quality assurance ("QA")/quality control ("QC") staff, and project managers. (Pl.'s UF ¶ 9, Dkt. No. 65; Def.'s Resp. ¶ 9, at 4, Dkt. No. 70.) Davey organized the Audit by circuit, providing one QC report for each circuit. (Pl.'s UF ¶ 18, Dkt. No. 65.) Davey's field technicians collected data using the Field Maps application. (Def.'s UF ¶ 13, Dkt. No. 67.) Davey's "digitizers," a term for data entry employees, then converted the collected information into a digital format for integration into MapWise. (*Id.*) Once Davey digitized the data into MapWise or when NISC uploaded Davey's collected photos into MapWise, it became embedded in that software with no way to segregate or extract it. (Def.'s UF ¶ 16, Dkt. No. 67.) CDEC had daily access to MapWise and all the data in it. (Def.'s UF ¶ 8, Dkt. No. 70 at 13 of 25.)

Regarding invoices, the Agreement said that Davey would prepare them monthly and CDEC would have 30 days to review the data. (Def.'s UF ¶ 4, Dkt. No. 70 at 12-13 of 25.) Davey invoiced CDEC for all work completed on the Audit. (*Id.*)

### C.  Performance issues, time extensions, and communications about the Audit

Davey provided 24 QC reports to CDEC throughout the course of the Audit for 28 circuits. (Pl.'s UF ¶ 20, Dkt. No. 65; Def.'s Resp., UF ¶ 20, at 7-8, Dkt. No. 70.) Davey delivered the first QC report to CDEC on July 6, 2022, for the Grants #1100 circuit, and the final QC report on April 13, 2023, for the Ramah #9100 and #9200 circuits. (Pl.'s UF ¶ 20, Dkt. No. 65.)[4]

Each week, CDEC and Davey held a meeting during which CDEC would make Davey aware of alleged performance issues. (Def.'s UF ¶ 5, Dkt No. 70 at 13 of 25.) Afterwards, CDEC sent weekly meeting notes to Davey, and Davey would add notes and questions before returning the notes to CDEC. (*Id.*) Errors were also communicated to Davey through email. (Pl.'s UF ¶ 25, Dkt. No. 65.) Throughout the term of the Contract, CDEC staff continuously notified Davey of errors and issues with Davey's work for Davey to address. (*See* Pl.'s UF ¶ 25, Dkt. No. 65; Def.'s UF ¶ 6, Dkt. No. 70 at 13 of 25.) For example, when Davey completed its audit of the pilot circuit, known as the 1100 circuit, CDEC provided Davey with a review of its work, identifying specific

---

[4] The parties contest the accuracy of the QC reports. CDEC asserts that of the 24 QC reports, only 17 QC reports considered joint-use ("Foreign") attachments, while the other seven reports made no mention of joint-use attachments. (Pl.'s Mem. ¶ 22, at 9, Dkt. No. 65.) According to CDEC, the QC reports that considered joint-use attachments only assigned two attributes for each feature of "Foreign Attachments" in the circuit (out of 87 attributes considered in the QC reports). (*Id.*) CDEC contends that, according to Exhibit A to the Contract, Davey had to provide at least five attributes for joint-use attachments (joint-use type, company, and quantity and whether the poles had joint-use tags or NESC violations). (Pl.'s Mem. ¶ 23-24, at 9, Dkt. No. 65.) CDEC argues that Davey instead under-weighted joint-use attachments in the QC reports by assigning only 2.2% (2 out of 87) of the weight in each of the 17 QC reports and assigning 0% of the weight in the other seven QC reports. (*Id.* ¶ 24.) CDEC also asserts that none of the QC reports gave any weight to photos as a QC attribute. (*See* Pl.'s Mem. 10 ¶ 27, Dkt. No. 65 (citing Pl.'s Ex. 11, Dkt. No. 65-11).)

Davey denies that the QC reports that considered joint-use attachments only assessed and assigned two attributes for each feature of "foreign attachments" in the circuit. (*See* Def.'s Resp. ¶ 22, at 8-9, Dkt. No. 70; Hawbaker Aff. ¶¶ 14-15, Dkt. No. 70-4 at 4 of 23.) While Davey admits that some QA/QC reports did not specifically list out separately the category of joint use, it cites evidence that its employees looked at joint-use attributes and checked the accuracy of joint use in their QA/QC work. (*See* Def.'s Resp. ¶ 22, at 8-9, ECF No. 70 (citing Saagman Dep. 40:25-41:6, Dkt. No. 70-7).) Davey says that only about 18,000 of the 61,817 poles contained joint users, and only three to five attributes for each of those roughly 18,000 poles dealt with joint use. (*See* Def.'s Resp. 9 ¶ 23, Dkt. No. 70; Larson Dep. 24:9-17, Dkt. No. 70-1.) Although it did not make photos a separate line item in the QA/QC reports, Davey relies on testimony from an employee whose role was QA/QC that he considered photos routinely during the QA/QC process. (*See* Def.'s Resp. 10-11 ¶ 27, Dkt. No. 70; Saagman Dep. 39:4-22, Dkt. No. 70-7.)

issues that required correction. (Def.'s UF ¶ 27, Dkt. No. 67 at 8 of 25.) For each issue CDEC identified, Davey either addressed it or was making efforts to resolve it. (Def.'s UF ¶ 31, Dkt. No. 67.)[5] Although the Contract initially stated that Davey would complete its work by November 4, 2022, the parties agreed to extend the field work deadline to the end of December 2022. (Def.'s UF ¶ 3, Dkt. No. 70 at 12 of 25.)[6]

On January 5, 2023, Rick Brown ("Brown"), a Davey Account Manager, emailed CDEC's then-Telecommunications Manager Danny Stokes ("Stokes"), who was one of the direct contacts for Davey during the Audit, about the holdup in CDEC not reviewing and approving the Grants #1100 Pilot, noting that it "has been over 14 days since the delivery of the photos for Grants 1-1 (PILOT)." (Jan. 5, 2023, email, Dkt. No. 65-6 at 3 of 4; Stokes Decl. ¶¶ 1-4 & Ex. 1, Dkt. No. 65-6 at 1-3 of 4.) Brown noted that the pilot was "delivered as of Dec 20th, 2022" and Davey was "awaiting CDEC to review and approve it." (Jan. 5, 2023 email, Dkt. No. 65-6 at 3 of 4.)[7]

---

[5] The parties dispute whether Davey resolved the specific issues CDEC raised with the 1100 circuit. *See* discussion in n.7 and n.10 *infra*.

[6] CDEC orally agreed to extend the joint-use portion of the project until the end of December 2022. (*See* Larson Dep. 67:23-68:25, Dkt. No. 65-4; Maestas Dep. 37:17-38:11, Dkt. No. 65-3.) CDEC wanted the joint use portion done by January 1, 2023, so it could send out invoices to third parties. (*See* Maestas Dep. 37:17-38:11, Dkt. No. 65-3.) CDEC's position is that Davey did not complete the joint-use component of the Audit by December 23, 2022, or even by the time it terminated the Contract. (*See id.* at 38:3-23; Larson Dep. 67:23-68:25, Dkt. No. 65-4.) CDEC considered completed work to be the pole audit, joint use, and photos. (Larson Dep. 40:19-22, Dkt. No. 67-1 at 11 of 140.) CDEC believed that photos should be factored into the accuracy rate. (*See id.* at 47:10-23, Dkt. No. 67-1 at 12 of 140.) Larson testified that photos are missing on every or nearly every circuit and that there may only be one circuit for which Davey completed and met all the specifications. (Larson Dep. 42:24-43:10, Dkt. No. 69-2.)

According to Davey, it completed the field mapping work and digitizer's work by December 23, 2022, and the QA/QC work on March 31, 2023. (*See* Littlefield Dep. 59:2-10, 91:19-92:13; Dkt. No. 70-6.) By December 23, 2022, Davey asserts that all the data was in the MapWise system (other than the inaccessible features), and CDEC had access to that system. (*Id.* at 91:19-92:13.)

[7] CDEC relies on the email as evidence that CDEC did not accept the Grants #1100 pilot circuit as complete because Davey had not delivered the photos associated with the circuit. (Pl.'s Mem. ¶ 21, at 8, Dkt. No. 65.) Davey, however, denies that CDEC did not accept this circuit as complete, relying on the Contract language requiring CDEC to formally reject completed work within 30 days of delivery. (Def.'s Resp. ¶ 21, at 8, Dkt. No. 70.) Davey asserts that, because it delivered the QA/QC report for the #1100 circuit on July 6, 2022, and Davey did not communicate a rejection of the circuit within 30 days, and paid invoices that included the work, CDEC accepted the work as complete. (*Id.*) Consequently, although the contents of the January 5, 2023 email are not disputed, whether CDEC rejected the #1100 circuit work, and did so timely, is disputed.

In April 2023, Anna Larson ("Larson"), GIS Analyst with CDEC, documented alleged errors with joint-use data in a spreadsheet, including errors with incorrect pole tags. (*See* Pl.'s UF ¶¶ 26, 28, Dkt. No. 65; Def.'s Resp. ¶ 26, at 10, and ¶ 13, at 14, Dkt. No. 70; Def.'s Br., UF ¶ 36, Dkt. 67; Pl.'s Reply 3, Dkt. No. 72.) CDEC documented its issues with joint use in the spreadsheet it created in April 2023 and updated in September 2023. (Def.'s UF ¶ 36, Dkt. No. 67; Pl.'s Reply 3, Dkt. No. 72.) After CDEC sent the joint-use spreadsheet to Davey, CDEC and Davey discussed the joint use issues at the weekly meeting. (Def.'s UF ¶ 13, Dkt. No. 70 at 14 of 25; Pl.'s UF ¶ 28, Dkt. No. 65.)

On May 9, 2023, Stokes sent an email to Tommy Maloney ("Maloney"), Davey's Senior Project Developer. (Pl.'s UF ¶ 13, Dkt. No. 65.) The email informed Maloney:

> I am having serious issues trying to vet the joint use. I have attached what has been extracted from the system into KMZ.. how am I supposed to bill these? I have spent days just editing the small ones on kmz so they can be corrected in the system?

(Stokes Decl. ¶ 7 & Ex. 2, Dkt. No. 65-6 at 2, 4 of 4.)[8]

Larson prepared a second excel spreadsheet detailing by circuit the poles she reviewed that had missing photos at the top of the pole, only one photo uploaded, or no photos at all, as well as poles that were mapped incorrectly. (*See* Pl.'s UF ¶¶ 26, 28, Dkt. No. 65; Def.'s Resp. ¶ 26, at 9, Dkt. No. 70.)[9] CDEC sent the photo spreadsheet to Davey on May 25, 2023. (*See* Pl.'s UF ¶ 28, Dkt. No. 65; Def.'s Resp. ¶ 28, at 10, Dkt. No. 70; Hawbaker Aff. ¶ 5, Dkt. No. 70-4.)

Davey repeatedly addressed and worked to address photo issues as they arose, even going as far as creating a tool to check large data sets against one another for missing or duplicate issues

---

[8] According to CDEC, "kmz" is a geographic data file. (Pl.'s Mem. ¶ 13, at 6, Dkt. No. 65.) Davey does not appear to dispute that characterization. (*See* Def.'s Resp. ¶ 13, at 5-6, Dkt. No. 70.)

[9] The parties dispute the number of errors identified in the second spreadsheet: Continental says "thousands of poles" while Davey says the spreadsheet identifies only 188 poles. (*Compare* Pl.'s Mot. 10 ¶ 26, Dkt. No. 65, *with* Def.'s Resp. 9 ¶ 26, Dkt. No. 70.)

to help resolve or expedite the photo process. (Def.'s UF ¶ 39, Dkt. No. 67.) CDEC's primary focus

was that Davey failed to provide it with the photos as outlined in the Agreement. (Def.'s UF ¶ 38,

Dkt. No. 67.)[10]

Additionally, Stokes, while working on a separate project, observed that Davey employees

had incorrectly marked 900-1200 poles. (*See* Pl.'s UF ¶ 16, Dkt. No. 65.) He sent an email on June

6, 2023, to Maloney and Adam Littlefield ("Littlefield"), Project Manager for Davey, which said:

> I have found major issue with the audit. All the attachments / violations that I have
> looked at mapped so far have been grossly off. The corrections I had asked for
> Anna, and I had to go in and correct ourselves. I know of at least 15 violations that
> are missed.. I drive by them every day. And while out in the field on a different
> issue I have found at least 900-1200 poles missed. These should be CenturyLink
> poles and only the RedBolt is marked. There were a few comments in regard to
> pictures on one of the calls that my boss definitely did not take kindly to. I know in
> just sampling random areas there are at least 200 photos missing. Whole community
> areas missing. I have one with 5 photos of an anchor and 1 pole tag as an example.
> We are way past the date and are not getting any resolution? Who's going to correct
> these? Who's going to go out and change / add tags on incorrect locations? How
> many more incorrect photos / missing photos do we have? I have my upper
> management and board questioning these things because we cannot bill any of our
> attachers because the data creates a liability. And we are 7 months behind billing
> these? My management wants liquidated damages at this point if it can't be
> corrected by the end of this month? I need answers.

(June 6, 2023 email, Dkt. No. 65-8.)

Two days later, on June 8, 2023, Littlefield sent an email to Stokes, among others,

saying that he understood Stokes's "concerns with the data and am not disputing that those

concerns are valid," but noting that it "is important that this is approached in an organized

---

[10] CDEC contends that the Grants #1100 pilot was delivered late, because not all the photos required under the Contract had been provided by Davey. (Stokes Decl. ¶ 4, Dkt. No. 65-6.) As previously noted, Davey asserts that CDEC never communicated that it rejected the work on the Grants circuit. Rather, CDEC paid Davey's May, June, July, August, and November 2022 invoices, which included work on the Grants #1100 pilot circuit. (*See* Hawbaker Aff. ¶ 3, Dkt. No. 70-4 at 3 of 23.) According to Davey, because CDEC did not formally reject the work within 30 days of delivery (on July 6, 2022), the work is deemed approved and accepted under the Contract. (Def.'s Resp. ¶ 12, at 5, ¶ 21, at 8, Dkt. No. 70.) Davey also relies on testimony by Larson who said that Davey fixed the issues she raised regarding the 1100 circuit (although she also said in the cited deposition excerpt that the circuit was still missing photos). (*See* Def.'s Br. 8 ¶¶ 27-28, Dkt. No. 67 (citing Larson Dep. 65:18-21, Dkt. No. 67-1 at 17 of 140).)

manner to ensure it can be resolved in the most timely manner." (June 8, 2023 email, Dkt.

No. 67-1 at 96 of 140.) Littlefield explained:

> Ken and I will take the notes you have resent and get the issues documented in a feeder based format and determine which items remain unresolved. Information in regards to concern must be provided in a feeder by feeder basis. Upon DRG's statement of completion of each feeder, Continental Divide is provided 30 days to review the data and if Continental Divide can show based on their review that DRG has fallen outside of the 3% attribute error rate for that feeder as a whole, DRG holds the responsibility to return that feeder and perform an additional 5% QC check and resolve issues to ensure the attribute data falls within the 3%. It is best that our attention start at the first feeder considered delivered. Has it been thoroughly reviewed and does CDEC have the documentation suggesting the attribute data falls outside the 3%. When CDEC provides that documentation to DRG we will review the findings by verifying the attribute data on the poles documented as part of CDEC's review and ensuring that the data does indeed contain a more than 3% error rate, and schedule a return to that feeder…. I feel as if we work together to follow this process it will allow us to resolve these issues in the most time efficient manner.

(*See* June 8, 2023 email, Dkt. No. 67-1 at 96 of 140.)

Littlefield again emailed Stokes on July 27, 2023, relaying that he was told that Stokes was

"working on identifying JU [joint use] discrepancies and were cataloging those." (July 27, 2023

email, Dkt. No. 67-1 at 52 of 140; Def.'s UF ¶ 35, Dkt. No. 67.) Littlefield asked if Stokes had an

expected date to provide that information so that Littlefield could "start planning on sending a

team to resolve the issues." (July 27, 2023 email, Dkt. No. 67-1 at 52 of 140.)

Legal counsel for Continental sent a letter dated September 27, 2023, to Maloney and to

Davey's Regional Vice President, Steven Johnston. (*See* Sept. 27, 2023 letter, Dkt. No. 65-9.)

Therein, counsel stated that, to date, "the project has still yet to be completed in full, nearly a year

after the first agreed upon completion date," and "the services you have provided to our Client

have been subpar, defective, and wholly unacceptable." (*Id.*) The letter "demand[ed] that you

refund our Client the fees paid for the defective services, as provided in the Service Agreement."

(*Id.*) Counsel further noted that, if the matter could not be resolved, CDEC intended to pursue all

available recourse, including causes of action for breach of contract and breach of the covenant of good faith and fair dealing. (*Id.*)[11]

On October 2, 2023, Maloney sent an email directed to Stokes and others, in which he said:

We're looking for confirmation that these are the remaining outstanding issues:

1. ~3,300 pole/meter locations with photos which aren't accessible by CDEC
2. ~2,500 poles with misidentified owners of JU
3. ~2,500 poles with misidentified owners need tags of JU owners replaced
4. ~1,000 poles we couldn't tag with JU tags when originally on site because CDEC was short on tags[.]

We have detailed sheets from you on these issues, we're just looking for confirmation this aligns with your understanding of total issues.

(Oct. 2, 2023 email, Dkt. No. 67-1 at 97 of 140.)[12] Maloney asked for a response the following day so Davey could "mobilize on **10/9** to make these corrections," which he anticipated would take four weeks to complete. (*Id.*) As for the photos, by the time Davey determined the cause of

---

[11] The parties contest whether the September 27, 2023 letter constituted a written termination notice pursuant to the Contract terms. (Pl.'s Mem. ¶ 32, at 11, Dkt. 65.) Davey contends that the September 27, 2023 letter, based on its own terms, did not notify it that CDEC was terminating the Agreement. (Def.'s Resp. ¶ 28, at 10, Dkt. No. 70.) The parties also dispute whether the photos had all been delivered as of September 27, 2023. According to Continental, 40,000-50,000 photographs had not been delivered to it in viewable form, because when Davey downloaded them, they had been corrupted due to their sheer size. (*See* Pl.'s Mem. ¶ 14, at 6, Dkt. No. 65; Littlefield Dep. 70:6-72:4, Dkt. No. 65-7.) Those photographs remained on Davey's internal servers until after September 27, 2023. (*See* Littlefield Dep. 71:2-72:14, Dkt. No. 65-7.)

Davey asserts, however, that it delivered the photographs when it uploaded the photographs to NISC's File Transfer Protocol ("FTP") site. According to Littlefield, over a five-week period in August and September 2023, he uploaded the photographs to NISC through an FTP. (*See* Littlefield Dep. 70:6-72:3, 97:10-16, 114:8-18, Dkt. No. 70-6; Sept. 18, 2023 email, Dkt. No. 70-4 at 11-12 of 23.) Littlefield further testified that he reviewed photos as he digitized them in the MapWise database, but Davey employees could not review the photos within MapWise. (*See* Littlefield Dep. 29:16-30:2, Dkt. No. 70-6 at 3-4 of 18.) In a September 18, 2023 email from Littlefield to Jen Wangen, an ETL Specialist with NISC, Littlefield said: "I am starting a large upload of photos to the FTP. These are photos identified as missing by a query Steve had run and provided to me a few weeks back. I think this resolves about 70 percent of the missing photos." (Sept. 18, 2023 email, Dkt. No. 70-4 at 11-12 of 23; Hawbaker Aff. ¶ 7, ECF No. 70-4 at 3 of 23.) Davey says that NISC first alerted it to the photo upload issues in the large photo upload on September 19, 2023. (Hawbaker Aff. ¶ 7, Dkt. No. 70-4 at 3 of 23.) Littlefield learned from NISC that data corruption occurred due to the sheer size of the file when he downloaded it. (Littlefield Dep. 70:6-71:15, ECF No. 67-1.) Davey also asserts that most of the 40,000 to 50,000 photographs had been previously uploaded to NISC in or with other batches of photographs. (*See* Hawbaker Aff. ¶ 8, ECF No. 70-4 at 3 of 23.)

[12] CDEC characterizes the email as an acknowledgement by Davey that the identified issues were outstanding. Davey disputes that it conceded that the issues were indeed outstanding.

the issue to be potentially NISC's FTP site's inability to ingest the size of the upload, Davey was prepared to re-upload the file of photos in smaller sections to try to address NISC's FTP site's inability to accept large files. (Def.'s UF ¶ 17, Dkt. No. 70 at 14-15 of 25.)

CDEC's attorney emailed Maloney on October 4, 2023, instructing Davey to "cease communications with CDEC staff and direct all communications" to counsel. (Pl.'s UF ¶ 34, Dkt. No. 65; Oct. 4, 2023 email, Dkt. No. 67-1 at 54 of 140.) The parties agree the October 4, 2023 email constitutes a cease-and-desist letter. (Def.'s UF ¶ 22, Dkt. No. 70 at 15 of 25.) Continental refused Davey the opportunity to re-deploy to address the outstanding issues, and instead initiated this action, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (Def.'s UF ¶ 48, Dkt. No. 67.)[13]

### D. Evidence related to potential damages

The base cost of the Contract was $1,429,296.60. (Pl.'s UF ¶ 31, Dkt. No. 65.) To date, CDEC paid $1,327,354.00, which is 92.9% of the contemplated cost of the Contract. (*Id.*)

Continental cannot ascertain with a reasonable level of certainty which parts of the Audit are right and which are wrong without doing a new audit to confirm the work performed by Davey. (Pl.'s UF ¶ 29, Dkt. No. 65.) CDEC has not contracted with another entity to fix the alleged issues with the Audit. (Def.'s UF ¶ 50, Dkt. No. 67.) Although CDEC sought a budgetary estimate for a

---

[13] According to CDEC, thousands of joint-use errors remained after CDEC terminated the Contract, relying on testimony from Littlefield that CDEC did not have photos in an un-corrupted form as of August and September 2023. (*See* Pl.'s Mem. ¶ 28, at 10, Dkt. No. 65; Littlefield Dep. 71:2-72:14, Dkt. No. 65-7.) Continental asserts that Davey corrected the joint-use errors for only one of CDEC's users (Table Top). (Pl.'s Mem. ¶ 28, at 10, Dkt. No. 65 (citing Larson Dep. 113:8-117:4, Dkt. No. 65-4).) While Davey admits that CDEC *claimed* that thousands of joint-use errors existed, Davey told CDEC on October 2, 2023, that it was ready to work to correct the issues outlined in the email. (*See* Oct. 2, 2023 email, Dkt. No. 67-1 at 53 of 140.) Davey denies that it only made corrections for one of the joint users. In support, Davey relies on averments of its Area Manager, Joseph Hawbaker, who says that Davey engaged in discussions with Continental to address the issues set forth in the spreadsheet, and updated joint-use ownership records within MapWise based on conversations with Continental and in response to the spreadsheet. (*See* Def.'s Resp. ¶ 28, at 10, Dkt. No. 70; Hawbaker Aff. ¶¶ 10-12, Dkt. No. 70-4 at 4 of 23.) Additionally, Davey contends that it was unable to re-upload the photos because CDEC directed it to cease communications and work for CDEC on October 4, 2023.

joint-use-only audit, CDEC has not obtained a final proposal for the cost of conducting such an audit. (*Id.*) CDEC has not sought any estimate for re-doing the full inventory audit. (*Id.*)[14]

### III.    LAW

The parties agree that the substantive law of New Mexico applies.

#### A.  Law on Breach of Contract

To prevail on a breach of contract claim, a plaintiff is required to prove a valid contract, breach of the contract, causation, and damages. *See Construction Contracting & Mgmt., Inc. v. McConnell*, 1991-NMSC-066, ¶ 10, 112 N.M. 371; *Central Market, Ltd., Inc. v. Multi-Concept Hospitality, LLC*, 2022-NMCA-021, ¶ 38, 508 P.3d 924. "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." *Rivera v. American Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 27, 150 N.M. 398 (quotations omitted). When considering whether contract language is ambiguous, a court may examine extrinsic evidence of the circumstances surrounding the making of the contract and any relevant usage of trade, course of dealing, and course of performance. *See C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 15, 112 N.M. 504. Whether the agreement contains an ambiguity is a matter of law for the trial court. *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778. "If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a

---

[14] The parties dispute damages. According to CDEC, it cannot use the work provided by Davey, because it does not know, without conducting another audit, which data Davey inputted is accurate. (*See* Maestas Dep. 41:10-42:12, Dkt. No. 65-3.) CDEC conducts joint-use audits to ensure joint users have not attached to more poles than they say they are attached to and have a proper accounting for billing and safety purposes. (*See* Larson Dep. 28:14-25, Dkt. No. 65-4.) Although the data is in the MapWise system, CDEC does not believe it is accurate enough to verify who is on which poles, and how many poles each joint user is on, to be able to bill its joint users correctly. (*See* Larson Dep. 96:3-21, Dkt. No. 67-1 at 25 of 140.) CDEC chose to bill its joint users from its 2017 audit instead. (*See* Maestas Dep. 44:25-46:18, Dkt. No. 65-3.) Davey disputes that CDEC is not using its work, relying on evidence that Davey's data is embedded in CDEC's MapWise system with no way to segregate it. (Larson Dep. 96:3-97:16, Dkt. No. 67-1 at 25-26 of 140.)

matter of law." *Id.* If, however, "the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." *Id.* Then, if the extrinsic evidence is disputed, turns on witness credibility, or is susceptible of conflicting inferences, the fact finder must resolve the meaning of unclear terms in the contract. *Id.* at ¶¶ 12-13.

### B.  Law on Breach of the Duty of Good Faith and Fair Dealing

In New Mexico, "every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449. The covenant requires that parties not do anything that will injure the other's rights to receive the benefit of their agreement. *Id.* To show breach of the covenant of good faith and fair dealing, the party asserting the claim must demonstrate bad faith by the other party or that the other party wrongfully and intentionally used the contract to the party's detriment. *Id.*

### IV.   Davey's Motion for Summary Judgment

### A.  Whether CDEC can prove quantifiable damages arising from breach of contract

Plaintiff withdrew its expert in economics and calculating damages. (*See* Pl.'s Expert Witness Disclosure, Dkt. No. 29; Pl.'s Withdrawal of its Expert Witness Disclosure, Dkt. No. 61.) Consequently, Davey argues that CDEC has no evidence of quantifiable damages stemming from the alleged breach to sustain a claim. Davey disputes that CDEC is entitled to damages in the form of the cost to conduct a new audit or that CDEC can prove damages for the projected cost to hire another company to perform the same audit, as it lacks evidence of what another audit would cost. With respect to consequential damages, Davey argues that they are barred by the express language of the Contract.

CDEC responds that, because Davey's work cannot be used, it is entitled to recover all amounts paid to Davey under the Contract ($1.327 million). (*See* Pl.'s Resp. ¶ 11, at 4, and 12, Dkt. No. 69.) As an initial matter, it is unclear whether Continental is seeking consequential damages. (*See* Pl.'s Resp. 11-12, Dkt. No. 69 (refuting that "CDEC seeks to recover damages for lost revenue for annual pole rental fees, lost revenue from joint-use violations, projected costs to hire a new company to perform again parts of the Audit, lost revenue from cost sharing, and the amount paid to DRG for the Audit" and stating "CDEC seeks to recover all amounts paid under the Contract—the work on the Audit provided by Davey is worthless to CDEC").) Despite appearing to limit its damages to the amounts paid under the Contract, CDEC refuted that Section 13.1 of the Contract waived all claims to consequential damages because it did not mention "consequential damages." (*Id.* at 6-7.)

To prevail on a breach of contract claim, the plaintiff must prove damages arising from the breach of contract. *Jaynes v. Strong-Thorne Mortuary, Inc.*, 1998-NMSC-004, ¶ 11, 124 N.M. 613. Damages must be proved with reasonable certainty and not based on conjecture or speculation. *Mascarenas v. Jaramillo*, 1991-NMSC-014, ¶ 22, 111 N.M. 410. "[W]hen it is possible to present accurate evidence on the amount of damages, the party upon whom the burden rests to prove damages must present such evidence." *First Nat'l Bank in Albuquerque v. Sanchez*, 1991-NMSC-065, ¶ 18, 112 N.M. 317 (explaining that evidence for attorney's fees was speculative where testimony was that fees were "close to $30,000"). Generally, "the purpose of contract law is to compensate the nonbreaching party for the damages caused by the breaching party's nonperformance." *Paiz v. State Farm Fire and Cas. Co.*, 1994-NMSC-079, ¶ 30, 118 N.M. 203. An injured party, however, "should not be put in a better position than had the contract been

performed." *Id.* Nor may a party recover damages for any loss that the party reasonably could have avoided. UJI 13-860 NMRA.

To the extent Continental seeks consequential damages, the Court finds that consequential damages are barred as a matter of law by the plain reading of the Contract. The Limitation of Liability provision expressly says that no party will "be liable for any indirect, incidental, special, exemplary, punitive, or enhanced damages, arising out of, or relating to, this Agreement or in connection with any breach under this Agreement…." (Contract ¶ 13.1, at 3, Dkt. No. 1-1 at 18 of 196.) The New Mexico Supreme Court has looked to Black's Law Dictionary to define "consequential damages." *Primetime Hospitality, Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 25, 146 N.M. 1. According to Black's Law Dictionary, "consequential damages" are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act.— Also termed *indirect damages*." *Damages*, Black's Law Dictionary (12th ed. 2024) (italics in original). Indirect damages are expressly barred by the Contract. That the Contract did not use the term "consequential damages" is of no moment where "consequential damages" mean "indirect damages" as a matter of law.

Next, the Court turns to whether Continental has produced enough evidence that a reasonable factfinder could find that it is entitled to a full refund under the Contract. Davey asserts that CDEC cannot prove entitlement to a full refund because it admits it received a benefit from Davey's work: it is undisputed that the data is integrated into CDEC's MapWise database. Moreover, Davey cites testimony that the issues CDEC had with the data were limited to joint use and photos, not the full inventory audit. (*See* Larson Dep. 47:18-23, Dkt. No. 67-1 at 12 of 140.) Davey thus contends that CDEC must quantify the amount it paid for work that remains unresolved – here, only joint use and photos – not the amount it paid for the full audit. According to Davey,

CDEC cannot quantify that amount, so Davey is entitled to summary judgment on the breach of contract claim.

CDEC counters that, under the Limited Warranty provision, it is entitled to a full refund of fees paid for the defective part of the work. According to CDEC, it produced evidence that the entire Audit is defective. CDEC cites to the deposition of Lee Maestas who testified that none of Davey's work could be used because CDEC did not know what was right and what was wrong. (Maestas Dep. 41:10-14, Dkt. No. 65-3.) Anna Larson testified that, although the data Davey provided is part of CDEC's system, CDEC "cannot use the joint use to bill our joint users" because "it's not accurate enough to verify who's on what poles and how many number of poles each joint user is on." (Larson Dep. 96:3-10, Dkt. 96:5-12.) Additionally, she testified that, since CDEC cannot access the photos, it cannot verify that the audit is correct without essentially conducting another audit. (*See id.* at 96:5-21, Dkt. No. 67-1; *id.* 116:3-10, Dkt. No. 65-4.) Indeed, the parties do not dispute that Continental cannot ascertain with a reasonable level of certainty which parts of the Audit are right and which are wrong without doing a new audit to confirm the work performed by Davey. (Pl.'s UF ¶ 29, Dkt. No. 65.)

Section 5 of the Contract, the Limited Warranty provision, says that, if Davey breached the Limited Warranty, "Davey will, in its reasonable discretion, either (i) re-perform the defective part of the Services or (ii) credit or *refund the fees paid for the defective part of the Services*." (Contract ¶ 5, at 2, Dkt. No. 1-1 at 17 of 196 (italics added).) CDEC's lack of evidence on a cost breakdown of different portions of the Audit has put it in the position where its ability to prove damages hinges on a finding that the entire Audit was defective. Nevertheless, the amount CDEC paid to Davey is known and quantifiable. Should CDEC be able to prove that the entire Audit was defective due to its inherent unreliability, then the damages are not speculative.

CDEC argues that, given the nature of the Audit, it is reasonable to infer that Davey's inaccurate work cannot be separated from its accurate work, rendering the entire Audit defective. Consequently, CDEC contends that, as the nonmoving party, it is entitled to a reasonable inference that the entire Audit is worthless based on Maestas's and Larson's testimony, the large number of missing photographs, the profuse number of errors, and the purpose of the Audit. This Court agrees.

While Davey has presented evidence suggesting that the non-joint-use portion of the Audit was not defective, or perhaps, one circuit might not have been defective, the Court must construe the record in favor of CDEC. Larson's testimony was not clear that one circuit was entirely error-free or which it was. Nor is it clear how many photos could be viewed within MapWise, or how much of the non-joint-use portion of the Audit contained errors. CDEC has testimony that the Audit was so riddled with errors as to be completely worthless to it. That another Audit would need to be undertaken to determine accuracy is evidence that the entire Audit was defective. Because the Court must view inferences in favor of CDEC, the Court will deny summary judgment to Davey on the breach of contract claim based on the quantifiability of the damages.

**B. Whether CDEC improperly interfered with Davey's ability to fulfill its obligations under the Agreement**

Davey additionally argues that it is entitled to summary judgment on CDEC's breach of contract claim because CDEC interfered with its ability to fulfill its obligations under the Contract in two ways. First, Davey contends that CDEC failed to provide notice of an alleged breach as required by Section 29 of the Agreement. Second, Davey asserts that CDEC refused to allow Davey to re-perform defective services, which was a remedy Davey was entitled to choose under the Limited Warranty section.

Turning to the first argument, according to Section 29, Davey had to conform to a 97% accuracy rate per circuit. (Contract ¶ 29, at 6-7, Dkt. No. 1-1 at 21-22 of 196.) Contrary to CDEC's argument, although a comma is misplaced, Section 29 is not nonsensical. The provision logically reads that Davey "will be notified" if the circuit fails the accuracy rate. (*Id.*) Once notified, Davey had the duty to review the errors with CDEC and review an additional 5% of the features on that circuit. (*Id.*) Davey asserts it is entitled to summary judgment on CDEC's breach of contract claim because it is undisputed that CDEC never notified Davey that any given circuit fell below a 97% accuracy rate.

Section 29, however, defines the "Accuracy Statement." It is not the notice provision. The "Notice" provision merely required all notices, demands, and other communications under the Agreement to be in writing, and it allowed notice by email, among other written means. (Contract ¶ 24, at 6, Dkt. No. 1-1 at 21 of 196.) To terminate the Contract, either party had to give written notice that the other party materially breached the Agreement. (*Id.* ¶ 17.2, at 5.)  Essentially, Davey's argument is that material breach is limited in scope by the Accuracy Statement provision. The Court, however, finds the Contract language too ambiguous to make that determination as a matter of law.

As CDEC rightly points out, other sections of the Agreement suggest standards for material breach in addition to the 97% accuracy clauses. Section 5, the Limited Warranty provision, says that Davey can breach that section if its work is not performed in a timely, professional, and workmanlike manner. (Contract ¶ 5, at 2, Dkt. No. 1-1 at 17 of 196.) Additionally, the "Approval of Work" section gives Continental the right to "reject all work *not performed in accordance with the specifications or* within the 97% accuracy standard per circuit on the full-scale project." (Contract ¶ 28, at 6, Dkt. No. 1-1 at 21 of 196 (italics added).) The specifications were set out in

Exhibit A, which included, among other deliverables, three photos per pole. (*See id.* ¶ 2, at 1, and 9.)

CDEC contends that Davey breached the Contract by failing to perform the Contract by the agreed-upon deadline and by failing to perform the Contract in a reliable, professional and workmanlike manner. CDEC has evidence that it gave notice to Davey of these issues in the June 6, 2023 email. Although Larson did not specifically tell Davey in the weekly meetings that the accuracy rate fell below 97%, (Larson Dep. 57:15-58:4, Dkt. No. 73-5), there is evidence that CDEC calculated the joint-use error rate as about 93 percent, (Larson Dep. 120:5-19, Dkt. No. 67-1 at 34 of 140). CDEC also submitted evidence that Larson created spreadsheets with lists of errors CDEC found, which she provided to Davey and discussed with Davey in the weekly meeting. (*See* Larson Dep. 80:6-81:4, 106:6-107:21, 114:4-116:13, Dkt. No. 67-1 at 31 of 140; Def.'s UF ¶¶ 36-37, Dkt. No. 67.) Construing all inferences in favor of CDEC, the Court cannot find as a matter of law that CDEC failed to provide notice of breach merely because it failed to say explicitly that Davey did not meet the 97% accuracy rate on one or more circuits in the June 6, 2023 email.

Second, Davey asserts that CDEC failed to mitigate its damages according to the Limited Warranty provision. In New Mexico, "an injured party has a responsibility to mitigate its damages, or run the risk that any award of damages will be offset by the amount attributable to its own conduct." *Air Ruidoso, Ltd., Inc. v. Executive Aviation Center, Inc.*, 1996-NMSC-042, ¶ 14, 122 N.M. 71. The general rule that a party must use reasonable diligence to mitigate the damages about to be suffered from breach of contract applies to actions for breach of warranty. *Mitchell v. Jones*, 1943-NMSC-020, ¶ 12, 47 N.M. 169. Mitigation of damages is an affirmative defense. *Hickey v. Griggs*, 1987-NMSC-050, ¶ 22, 106 N.M. 27.

The Limited Warranty provision says that, upon breach by Davey, Davey has the "reasonable discretion" to decide whether to re-perform the defective part of the work or to credit or refund the fees paid for the defective part. (Contract ¶ 5, at 2, Dkt. No. 1-1 at 17 of 196.) Davey argues that CDEC failed to allow it to exercise its rights under the Contract by issuing the cease-and-desist letter, and thus, that CDEC failed to mitigate its alleged damages. According to Davey, CDEC breached the Contract when it deprived Davey of the opportunity to exercise its elected remedy explicitly set forth in the Limited Warranty provision.

CDEC counters that Davey could not cure the default for breach based on untimeliness – Davey had already missed its deadline by at least six months. CDEC argues that it is entitled to a full refund with no offset for work that may have been accurate, because it is reasonable to infer that Davey's inaccurate work cannot be separated from the accurate work, given the nature of the Audit. (Pl.'s Resp. 23, Dkt. No. 69.) The Court agrees that inference is reasonable, given that the purpose of an audit is to obtain accurate and reliable data. CDEC has evidence that the entire Audit was defective based on numerous inaccuracies and that the Audit was not completed in a timely manner. This evidence creates a question of fact as to whether it was reasonable to re-perform the entire Audit or whether a refund of fees was the only reasonable option. Accordingly, the Court will not grant summary judgment to Davey on the breach of contract claim.

### C. Whether CDEC's evidence rises to the level of breach of the implied covenant of good faith and fair dealing

Davey argues that CDEC has no evidence that Davey acted in bad faith or wrongfully or intentionally used the contract to the detriment of CDEC. Davey contends that the undisputed evidence shows that it attempted to resolve any outstanding issues in its October 2, 2023 email. In its response, CDEC failed to address Davey's arguments for summary judgment on CDEC's claim for breach of the implied covenant of good faith and fair dealing. The Court thus finds that CDEC

waived any argument that Davey is not entitled to summary judgment on the claim. *See Tele-Communications, Inc. v. C.I.R.*, 104 F.3d 1229, 1232-33 (10th Cir. 1997) (explaining that issues not raised are waived).

Even were CDEC to have not waived the issue, upon reviewing the record, the Court finds that the evidence, construed in CDEC's favor, is insufficient to rise to the level of bad faith or to show Davey wrongfully or intentionally used the contract to CDEC's detriment. It is undisputed that for each performance issue CDEC identified, Davey either addressed it or was making efforts to resolve it. (Def.'s UF ¶¶ 31, 35, Dkt. No. 67.) It is further undisputed that Davey repeatedly addressed and worked to address photo issues as they arose. (Def.'s UF ¶ 39, Dkt. No. 67.) Evidence of breach is not enough. Accordingly, Davey is entitled to summary judgment on CDEC's claim for breach of the implied covenant of good faith and fair dealing.

### D.   Whether the amount of liability is capped at $1 million

Davey additionally argues that Section 13 of the Agreement limits CDEC's damages to $1,000,000. Section 13, the Limitation of Liability provision, states that "in no event shall Davey's aggregate liability … exceed the applicable insurance limits set forth in Section 15…." (Contract ¶ 13.1, at 3, Dkt. No. 1-1 at 18 of 196.) Section 15 required Davey to maintain certain "minimum limits of insurance," including commercial general liability insurance "in an amount not less than $1,000,000 per occurrence and $2,000,000 in the aggregate." (*Id.* ¶ 15, at 4.) Davey argues that the "applicable insurance limits" is $1,000,000. On the other hand, CDEC asserts that Section 15 merely set out the minimum limits of insurance and the parties intended that the liability cap be set at Davey's actual insurance coverage, which exceeds $1 million. The Court agrees with Continental that Davey is not entitled to summary judgment on this issue. Section 13 says

"applicable insurance limits," not the minimum limits, creating an ambiguity that is for the factfinder.

### E. Whether Davey is entitled to summary judgment on its counterclaims

Davey asserts it is entitled to summary judgment on its breach-of-contract claim based on CDEC's failure to pay the outstanding amounts due and owing under the Contract. (Def.'s Counterclaim ¶¶ 23-30, Dkt. No. 4.) According to Davey's counterclaim, $290,678.93 is due and owing as of March 31, 2024. (*Id.* ¶ 28.) Davey contends that it either fulfilled its contractual obligations or attempted to fulfill them, but was prevented from doing so by CDEC's actions.

In support of summary judgment on its claim, Davey relies on the testimony of Larson who admitted that CDEC held two invoices of about $200,000 because CDEC did not receive the product requested. (Larson Dep. 19:15-20, Dkt. No. 67-1 at 4 of 140.) To establish that the work had been performed, Davey relies on the testimony of Littlefield, who testified that Davey bills monthly for completed work. (Littlefield Dep. 116:18-19, Dkt. No. 67-1 at 93 of 140). CDEC argues that Davey is not entitled to summary judgment on its counterclaim for fees remaining unpaid because CDEC has shown evidence that it is entitled to a full refund with no offset for Audit work that may have been accurate.

The termination provision says that CDEC must pay Davey "for all work performed." (Contract ¶ 17.3, at 5, Dkt. No. 1-1 at 20 of 196.) Larson's testimony, construed in CDEC's favor, is that CDEC did not pay the invoices because the work underlying the invoices had not been performed. Moreover, as set forth previously, questions of fact exist as to whether CDEC is entitled to a full refund under the Limited Warranty provision. The numerous questions of fact preclude granting summary judgment in favor of Davey on its counterclaims.

### V.  CDEC's Motion for Partial Summary Judgment

CDEC raises three main points in its partial motion for summary judgment. The Court will address them in the same order CDEC brought them, while construing the evidence in the light most favorable to Davey.

### A. Whether Davey breached the Contract by failing to complete the Audit by the original or extended deadline

CDEC first argues that Davey materially breached the Contract by failing to complete the Audit by November 4, 2022, or by the extended deadline. In support of its breach argument, CDEC contends that the Contract incorporated the Proposal and its statement about the importance of completing the project within CDEC's allotted time frame. Because CDEC's argument relies on the terms of the Proposal, the first question is whether the Proposal is part of the Contract.

Davey disputes that the Proposal was incorporated, relying on the "Exclusive Terms and Conditions" and "Entire Agreement" provisions, which state that the Contract is limited to the Agreement "together with Exhibit A." (Contract ¶ 1, at 1, and ¶ 25, at 6, Dkt. No. 1-1 at 16 and 21 of 196.) Those provisions suggest that the Proposal is not part of the Contract. On the other hand, page 8 states both that "CONTRACTORS PRICE PROPOSAL (EXHIBIT A) dated February 28th, 2022" and the "Scope of work (methodology) and pricing outline" "shall be considered" part of the agreement. (*Id.* at 8, Dkt. No. 1-1 at 23 of 196.) On Continental's motion for partial summary judgment, the Court must construe all inferences in favor of Davey. The Court finds that the blank "Exhibit B: Proposal" page and the "Scope of work (methodology) and pricing outline" clause do not conclusively establish the parties intended to incorporate the Proposal. Rather, an ambiguity exists. Because questions of fact exist as to what constitutes the entirety of the Contract and whether timeliness of performance was a material term, the Court will not grant partial summary judgment to CDEC on this issue.

### B. Whether CDEC terminated the Contract for cause on September 27, 2023

CDEC's second point in its motion is that it properly terminated the Contract for cause on September 27, 2023. According to CDEC, the undisputed facts compel the conclusion that Davey defaulted by failing to perform the Contract within the promised timeframe, and that CDEC's June 6, 2023 email gave written notice to Davey of its default in conformance with the termination provision of the contract. CDEC's argument that Davey defaulted by failing to perform the Contract within the promised timeframe relies on terms in the Proposal. (*See* Pl.'s Mem. 19, Dkt. No. 65.) Whether the timeliness term in the Proposal was incorporated into the Contract is a question of fact, and thus, CDEC is not entitled to partial summary judgment on this issue either.

### C. Whether CDEC is entitled to summary judgment on Davey's counterclaim for breach of the implied covenant of good faith and fair dealing

As its third and final point in its partial motion for summary judgment, CDEC contends that there is no evidence of bad faith on its part or that it wrongfully or intentionally used the Contract to Davey's detriment. It thus asks for summary judgment on Davey's counterclaim for breach of the implied covenant of good faith and fair dealing. Davey responds that CDEC's actions of engaging in continuous discussions to address its concerns while it positioned itself to assert an after-the-fact termination constitutes bad faith. According to Davey, the evidence that CDEC failed to provide it a meaningful opportunity to cure demonstrates CDEC intentionally used the Contract to Davey's detriment.

"The implied covenant is aimed at making effective the agreement's promises." *Azar v. Prudential Ins. Co. of America*, 2003-NMCA-062, ¶ 51, 133 N.M. 669. "Thus, it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party." *Id.* The Limited Warranty provision gave Davey the right to elect the remedy of reperforming defective work if CDEC invoked its rights under the Warranty provision and if the

remedy was reasonable. Questions of fact exist as to whether CDEC properly terminated the Contract or whether it prevented Davey from electing a reasonable remedy. The Court thus denies CDEC's request for partial summary judgment on Davey's counterclaim for breach of the covenant of bad faith and fair dealing.

## VI.    Motion to Exclude Expert Opinion Testimony of Scott Freeburn

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Rule 702 incorporates the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to ensure that proffered expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable. Fed. R. Evid. 702, 2000 Amendments. Trial courts have equally broad discretion in both determining the reliability and admissibility of expert testimony and in deciding how to assess an expert's reliability, including what procedures to use in making that assessment. *United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000).

When, as here, the court is the finder of fact, *Daubert*'s standard is more relaxed. *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012). "[W]hile *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). Because the Court will deny the cross motions for summary judgment, this case will proceed to a bench trial. It is most efficient to consider CDEC's objections to the testimony of Scott Freeburn at trial. The Court will therefore, in its discretion, stay decision on the motion to exclude until trial.

**IT IS THEREFORE ORDERED that:**

1.  CDEC's *Motion for Partial Summary Judgment* (**Dkt. No. 64**) is **DENIED**.

2. Davey's *Motion for Summary Judgment* (**Dkt. No. 66**) is **GRANTED** as to consequential damages and CDEC's claim for breach of the covenant of good faith and fair dealing, but it is otherwise **DENIED**.

3. CDEC's *Motion to Exclude Expert Opinion Testimony of Scott Freeburn* (**Dkt. No. 62**) is **STAYED** until trial.

4. The Court will schedule the trial by separate notice.

_____

SENIOR UNITED STATES DISTRICT JUDGE